S.O.S., INC., Plaintiff–Appellee,

v.

PAYDAY, INC., Defendant–Appellant.

Nos. 88–5817, 88–5878.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1989.
Withdrawn March 7, 1989.
Resubmitted Sept. 8, 1989.
Decided Sept. 13, 1989.

---

1082

Dennis G. Martin, Ashen, Golant Martin & Seldon, Los Angeles, Cal., for defendant-appellant.

Vincent Cox, Leopold, Petrich & Smith, Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, PREGERSON and LEAVY, Circuit Judges.

FLETCHER, Circuit Judge:

## BACKGROUND

This appeal from grants of summary judgment turns on the interpretation of a computer software agreement and presents issues of copyright law as well as pendent state law claims arising under trade secret, contract, and tort law. We affirm in part, reverse in part, and remand.

## STANDARD OF REVIEW

We review grants of summary judgment *de novo*. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). Because we begin our review with the district court's grants of summary judgment in favor of Payday, we view the facts initially in the light most favorable to S.O.S.

## FACTS

S.O.S., Inc. specializes in furnishing computer hardware and software to companies that process payrolls, ledgers, and accounts receivable. Payday, Inc. is a company which provides payroll and financial services to the entertainment industry.

In October 1978, S.O.S. acquired from Hagen Systems (not a party to this action) a non-exclusive license to unpublished business software called "Brown Tank." Under the license, S.O.S. could sublicense Brown Tank to end users provided Hagen Systems' proprietary and confidential rights in the software were protected. S.O.S. also had the right to prepare derivative works based on Brown Tank.

In November or December 1983, Payday's outside accountant, Mike Waldrip, told S.O.S.'s president, Bob Oliver, that Payday wanted to computerize in order to attract an important client. The initial understanding between Oliver and Waldrip was that Payday would use software furnished by S.O.S. on Waldrip's computer instead of installing a computer in its own office.

On December 14, 1983, Oliver sent Payday a draft contract, which Payday's president signed, providing for the purchase of a terminal and other hardware, to be installed in Payday's office; the lease of a disk drive and other hardware to be installed at Waldrip's office; and a software

agreement. The software agreement provides, in full:

> A software agreement covering the software outlined in the documentation furnished PAYDAY by SOS. The total purchase price of this software is $5,325 including sales tax. SOS agrees to modify the system to produce a text file capable of transfer in ASCII string code to magnetic tape at 800BPI for transfer of information to EDP (Service Bureau). *This series of programs is the property of SOS, and PAYDAY is acquiring the right of use, SOS retains all rights of ownership*. The payment schedule covering the software is $1,325 upon execution of this agreement and $1,000 on the 14th day of each month until a total of $5,325 has been paid. Changes and modifications other than those mentioned above, will be on a time and material basis at the rate of $50 per hour.

(Emphasis added.)

The contract does not use the terms "copyright" or "trade secrets." The parties did not discuss the meaning of the highlighted language referring to rights of "ownership" and "use."

Most of the programming of the payroll software was done by two employees of S.O.S., Eiichi Koyama and Bacchus Chu. 236 separate programs comprise the total package prepared for Payday. Of these, approximately 89 were derived or adapted from Brown Tank. Payday's controller, Sharon Goodman, was the liaison to the programming team. She described Payday's needs to S.O.S. but did not participate in the coding process.

The system (software and hardware) that S.O.S. provided was adequate for Payday's new client but not for Payday's entire business. In March 1984, S.O.S. and Payday modified portions of the contract. Under the modified agreement, Payday was to use S.O.S.'s computer for a monthly fee of $1,500; also, Payday agreed to pay monthly an additional $1,500 against accumulated programming charges. S.O.S. continued developing programs for Payday.

In late February 1985, Chu and Koyama left S.O.S. to form an independent consult-

ing service, but continued to render services for S.O.S. They continued to work on modifications to the payroll programs, for which they billed S.O.S. $28.00 an hour. They were also entrusted with systems backup, the routine copying of S.O.S.'s programs to protect against accidental loss. In April 1985, Chu and Koyama proposed to Goodman that Payday purchase an in-house computer system equipped with a broad array of software to provide financial services to the entertainment industry. Payday would make this software available to its customers on a timesharing basis. Chu and Koyama would perform programming services for Payday directly, at less than the $50.00 an hour Payday was currently paying S.O.S. for these services.

Notes taken by Goodman indicate concern over the cost of securing a copy of the payroll programs. She noted that Chu and Koyama could "make [a] copy and put [it] somewhere." Chu and Koyama told her they could change the programs 20%, and that this would make them new programs, no longer the property of S.O.S. They planned to copy the payroll programs into Payday's computer and then convert them into a different computer language called "BITS BASIC." Payday intended to send a letter to S.O.S. in July 1985, telling S.O.S. that Payday needed a copy of the payroll programs, but this letter was never sent. Instead, Payday solicited a competing bid from S.O.S. to provide an in-house computer system.[1]

Chu and Koyama met with Oliver on July 6, 1985. They told Oliver that Payday would pay its account balance with S.O.S. if S.O.S. would give Payday an unprotected copy of the payroll programs. Oliver rejected this proposal.

On July 7, 1985, Koyama went to the S.O.S. office and made at least one copy of the payroll software, which he gave to Payday.[2] Oliver began monitoring S.O.S.'s

computers for unauthorized entry, and changed the passwords. A day or two later, Chu or Koyama made an unauthorized entry into S.O.S.'s computer system by circumventing the password program.

Payday installed its new computer on July 14, 1985. The next day, Chu and Koyama put into Payday's computer the payroll software and various other programs taken from S.O.S.'s computer. During the next few days, Chu and Koyama converted the payroll programs from their original language into a format called "ASCII," which was in turn translated into the BITS BASIC computer language. Payday continued to request a copy of the payroll programs from S.O.S., requests intended, according to S.O.S., to conceal its software piracy. S.O.S. offered to install a protected copy of the software on Payday's computer, a copy which Payday could use but not enter, copy or change. Payday rejected this offer.

S.O.S. now suspected that Payday had copied its programs, because Payday was servicing its clients and Oliver did not believe Payday had had time independently to create new programs. S.O.S. registered the payroll programs on Oct. 11, 1985, in anticipation of litigation. Payday continued to modify the payroll programs on its computer. S.O.S. and Payday sued one another.

S.O.S. sued for infringement of copyright and pendent state law claims for breach of contract, misappropriation of trade secrets, and account stated. Payday counterclaimed under various state law theories, including abuse of process, breach of contract and tortious breach of the covenant of good faith and fair dealing, and sought a declaratory judgment that S.O.S.'s copyright is invalid. The district court granted summary judgment in favor of Payday on S.O.S.'s copyright infringement, breach of contract, and misappropriation claims, and

---

1. S.O.S. presents its version of the circumstances of this bid solicitation in greater detail, to show that there was evidence that Payday was not soliciting the bid in good faith. The circumstances surrounding the bid do not, however, appear to be relevant to decisions that must be made at this stage of the case.

2. Koyama asserts the copy was simply made as part of the routine systems backup he performed for S.O.S.

in favor of S.O.S. on its account stated claim and on Payday's counterclaims.

## SCOPE OF THE APPEAL

■ Payday asserts that S.O.S. did not appeal the denial of its motion for reconsideration, and thus evidence presented for the first time at the hearing on that motion should not be considered here. The motion for reconsideration was denied on January 4, 1988; the final judgment was entered March 9, 1988. The notice of appeal was filed March 11, 1988, purporting to appeal from the entire final judgment but only specifying denials of earlier motions. An amended notice of appeal was filed April 6, 1988, specifically appealing the motion for reconsideration as incorporated in the final judgment. The amended notice was filed within the 30 days provided by Fed.R. App.P. 4(a)(1).

This court has the inherent power to permit a party to amend a notice of appeal even without a formal motion. *Pope v. Savings Bank of Puget Sound*, 850 F.2d 1345, 1347 (9th Cir.1988). The amendment generally will be allowed where the intent to appeal a specific judgment can fairly be inferred and the appellee is not prejudiced by the mistake. *Id.* Both requirements are met here. The principal effect of including the motion for reconsideration within the notice of appeal is to expand the factual record on appeal. No new legal claims are presented. Payday was not prejudiced: it was able to deal with the "new" facts in both its briefs. *See Lynn v. Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1481 (9th Cir.1986), *aff'd,* — U.S. ——, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989). We conclude that the appeal properly in-

cludes the denial of S.O.S.'s motion for reconsideration.

## DISCUSSION

### I. Copyright Law Issues

To prevail on its claim of copyright infringement, S.O.S. must prove (1) ownership of copyright in the payroll programs, and (2) "copying" of protectible expression by Payday beyond the scope of Payday's license.[3] *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977). Payday challenges S.O.S. on both elements, arguing that S.O.S.'s copyright is invalid and that copying and modification of the software by Payday were permitted by the contract. The district court granted summary judgment for Payday on the latter theory, and therefore found it unnecessary to reach the issue of copyright validity.

### A. The Validity of S.O.S.'s Copyright

As a general rule, copyright vests initially in the author or authors of a work. 17 U.S.C. § 201(a). Copyright protection subsists from the moment the work is "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Registration is not a prerequisite to a valid copyright, although it is a prerequisite to suit. 17 U.S.C. § 408(a), § 411.[4] A certificate of registration made within five years of first publication is prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d

---

**3.** The word "copying" is shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106. S.O.S. in its complaint alleged infringement of three of these rights: the right to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, and to distribute copies of the work. 17 U.S.C. § 106(1)–(3). On appeal, S.O.S. addresses only Payday's alleged infringement of its reproduction and derivative work rights.

**4.** Payday disputes S.O.S.'s right to sue for violations of copyright in the underlying Brown

Tank programs, which have not been registered, and in any modifications to the program made by Chu and Koyama after leaving the employ of S.O.S. We need not resolve this question at this stage in the proceedings. S.O.S. clearly has a copyright in a considerable number of the payroll programs, sufficient to support an infringement claim at least *as to those programs.* During the time Chu and Koyama were employees of S.O.S., any software they created for S.O.S. was "work made for hire" under 17 U.S.C. § 101, vesting copyright in that software in S.O.S. under 17 U.S.C. § 201(b).

905, 908 (2d Cir.1980) (section 410(c) raises a rebuttable presumption shifting burden of coming forward with evidence to defendant). The presumptive validity of the certificate may be rebutted and defeated on summary judgment. *Seiler v. Lucasfilm, Ltd.,* 808 F.2d 1316, 1322 (9th Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).

Payday advances three arguments to rebut the presumption of validity. First, it argues that S.O.S.'s initial registration was a fraud on the copyright office which should prevent S.O.S. from enforcing its copyright. Second, Payday argues that the registrations were defective because they failed to disclose that Payday employee Sharon Goodman was a joint author of the software. Finally, Payday asserts there is an issue of fact as to the ownership of modifications made by Chu and Koyama after their regular employment with S.O.S. ended. We will address each of these contentions in turn.

### 1. Fraud on the Copyright Office

■ In S.O.S.'s initial application for copyright registration, S.O.S. identified itself as sole author of the payroll software, even though the work included the Brown Tank programs prepared by Hagen. S.O.S. subsequently filed a supplemental registration disclosing its use of Brown Tank. Payday asserts that this omission was a fraud on the Copyright Office which should be remedied by barring S.O.S. from enforcing its otherwise valid copyright.

We need not decide whether S.O.S.'s registration was in fact fraudulent for failing to disclose the identity of an unpublished underlying work. "Absent intent to defraud and prejudice, inaccuracies in copyright registration do not bar actions for infringement." *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1335 (9th Cir.1984). Payday alleges that S.O.S. intentionally omitted reference to Brown Tank in its registration in order to facilitate execution of a writ of seizure against Payday. However, this writ was quickly modified, and

Payday has not claimed any injury resulting from it. Payday has not demonstrated prejudice that would persuade us at the summary judgment stage to prohibit S.O.S. from pursuing its claim of copyright infringement.[5]

### 2. Joint Authorship

■ Payday argues that S.O.S.'s registration is invalid because it failed to designate Sharon Goodman, a Payday employee, as a joint author. Although Payday frames its joint authorship argument only in terms of its effect on S.O.S.'s registration, it should be noted that if the claim were successful it would dispose of the merits. As a joint author, Payday (through Goodman) would be entitled to modify, reproduce, or distribute copies of the work. 17 U.S.C. § 201(a), 106(1)–(3); *Pye v. Mitchell,* 574 F.2d 476, 480 (9th Cir.1978).

Authorship is a question of fact. *Del Madera Properties v. Rhodes and Gardner, Inc.,* 820 F.2d 973, 980 (9th Cir.1987). Payday has not presented evidence sufficient to raise a genuine issue of material fact regarding joint authorship. Payday alleges only that Goodman told the programmers what tasks the software was to perform and how it was to sort data. She did none of the coding and does not understand any computer language.

A claim of joint authorship on similar facts was rejected in *Whelan Assocs. v. Jaslow Dental Laboratory,* 609 F.Supp. 1307, 1318–19 (E.D.Pa.1985), *aff'd,* 797 F.2d 1222 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). In that case, a dental laboratory owner commissioned software for use in his business, disclosed to the programmers the detailed operation of his business, dictated the functions to be performed by the computer, and even helped design the language and format of some of the screens that would appear on the computer's visual displays. The court nonetheless found that the programmer was the sole author of the software. The court's principal focus was on the creation of the source and object

---

**5.** Equally dispositive is Payday's failure to present evidence that S.O.S.'s omission in its initial registration was intentional, as required by *Harris.*

code. The owner's "general assistance and contributions to the fund of knowledge of the author did not make [him] a creator of any original work, nor even the co-author. It is similar to an owner explaining to an architect the type and functions of a building the architect is to design for the owner. The architectural drawings are not co-authored by the owner, no matter how detailed the ideas and limitations expressed by the owner." *Id.*[6]

We conclude that the *Whelan* court's analysis is sound. Goodman, in our view, is not a joint author of the payroll programs. She did nothing more than describe the sort of programs Payday wanted S.O.S. to write. A person who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act. 17 U.S.C. § 101 defines a "joint work" as a "work prepared by two or more *authors.*" To be an author, one must supply more than mere direction or ideas: one must "translate[ ] an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid,* —— U.S. ——, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989). The supplier of an idea is no more an "author" of a program than is the supplier of the disk on which the program is stored. *Cf.* 17 U.S.C. § 102(b) (no copyright protection for ideas); 17 U.S.C. § 202 (copyright distinct from material object in which work is embodied). We therefore decline to affirm the district court's grant of summary judgment on the alternate basis of joint authorship.

### 3. Work for Hire

Chu and Koyama continued to work on the payroll programs for S.O.S. between the time their formal employment relationship with S.O.S. ceased and the time they began working directly for Payday. This interim work was most likely not work for hire, in which case copyright in that work would not automatically have vested in S.O.S. 17 U.S.C. § 201(a), (b); *see also Community for Creative Non–Violence,* 109 S.Ct. at 2178–79. Whether Chu and Koyama remained "employees" for purposes of the work for hire doctrine after their formal employment relationship with S.O.S. ceased, and the copyright implications of such a midstream change of status, are questions which we do not reach on this appeal. The parties did not present evidence or argument on these questions, and the district court did not consider them. We will generally not consider issues which were not presented to the district court. *See Bolker v. C.I.R.,* 760 F.2d 1039, 1042 (9th Cir.1985).[7]

### B. Copyright Infringement

The district court granted Payday's motion for summary judgment on S.O.S.'s claim of copyright infringement. The district court concluded that because Payday had a license to use the payroll programs, it could not infringe S.O.S.'s copyright. It also held that California law required that the contract be construed against S.O.S., placing the burden on S.O.S. explicitly to restrict Payday from making modifications. Absent such a restriction in the contract, the district court held, Payday acquired the unrestricted right to adopt and utilize the program.

The district court erred in assuming that a license to use a copyrighted work necessarily precludes infringement. A licensee infringes the owner's copyright if its use exceeds the scope of its license. *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 20 (2d Cir.1976). The critical

---

6. The *Whelan* court considered the client's contributions to the visual displays closer to the sort of creative input necessary for co-authorship, but nonetheless concluded they were "not of sufficient significance" to make the client a co-author of the program as a whole. *Id.* at 1319. Payday does not allege that Goodman contributed to the visual displays of the payroll program.

7. S.O.S. indicated at oral argument that it had entered into a settlement with Chu and Koyama which clarified the copyright status of their work in favor of S.O.S. Whether the settlement does in fact establish copyright ownership in S.O.S. and the effect on the rights of the parties to this litigation will be matters for the district court to consider on remand.

question is not the existence but the scope of the license.

■ The license must be construed in accordance with the purposes underlying federal copyright law. *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir.1988); *Harris,* 734 F.2d at 1334. Chief among these purposes is the protection of the author's rights. *Cohen,* 845 F.2d at 854. We rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy. *See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.,* 661 F.2d 479, 482–83 (5th Cir.1981) (state law rules of contract construction not preempted by federal law; however, application of state law to supply implied terms in copyright license would raise preemption question).

The district court applied the California rule that the contract should be interpreted against the drafter, *see Heston v. Farmers Ins. Group,* 160 Cal.App.3d 402, 415, 206 Cal.Rptr. 585, 593 (1984), thereby deeming S.O.S. to have granted to Payday any right which it did not expressly retain. This result is contrary to federal copyright policy: copyright licenses are assumed to prohibit any use not authorized. *Cf. Cohen,* 845 F.2d at 853 (license analyzed to determine what uses it affirmatively permits); 17 U.S.C. § 204(a) (transfer of copyright ownership must be in writing).

■ The contract between S.O.S. and Payday states, "This series of programs is the property of SOS, and PAYDAY is acquiring the right of use, SOS retains all rights of ownership." This language is unambiguous. Payday acquired the right to use the software, but S.O.S. retained all ownership rights. In the context of the parties' entire agreement, it is clear that the "right of use" was not intended to refer to copyright use. The contract does not refer explicitly to copyright or to any of the copyright owner's exclusive rights. Payday clearly was concerned solely with obtaining output in the form of processing payroll information for its customers.[8] The provisions stating that Payday would lease the disk drive and other hardware necessary to run the program, and that the equipment would be kept in the office of a third party (and later at S.O.S.'s office), demonstrate that neither party expected Payday to be able to gain access to the source code itself, as opposed to putting in its customers' data and receiving output.

S.O.S. concedes that Payday had a right to use the software on its own machines, but insists S.O.S. retained title to any copies. We agree. The literal language of the parties' contract provides that S.O.S. retains *"all* rights of ownership." (Emphasis added.) This language plainly encompasses not only copyright ownership, but also ownership of any copies of the software. Payday has not demonstrated that it acquired any more than the right to possess a copy of the software for the purpose of producing "product" for its customers.[9]

---

**8.** Were this a license between S.O.S. and another software writer, "right of use" might be more properly construed to include uses, such as modification of the software, otherwise reserved to the copyright holder. It is instructive to compare the language of the S.O.S./Payday contract with the language of the S.O.S./Hagen Systems contract, which was specifically drafted to allow S.O.S. to modify Hagen Systems' programs:

Hagen hereby grants S.O.S. the right to incorporate portions of payroll programs … referred to as "Brown Tank", into an application software package for the movie industry …, and agree[s] that S.O.S.'s right to use said software in such an application shall not be an infringement on any copyright that Hagen may now have or shall in the future procure.

C.R. 90, page 20.

**9.** The contract as originally drafted anticipated that Payday would not possess a copy of the program itself. Rather, the program was to run on Waldrip's computer, which Payday would lease. The parties probably did not consider whether Payday could have its own copy of the program if it bought its own computer. S.O.S. stood to make its largest financial return from the software on the rental of computer time, which could continue into perpetuity, and on expected later modifications of the software. S.O.S. also had an interest in protecting the software as a trade secret. Thus, in the event Payday decided to purchase its own computer, S.O.S. presumably assumed that Payday's right of use would be contingent on possessing only a "protected" copy of the software. This is precisely what S.O.S. offered, but with a large additional expense to Payday for protective modifications.

We conclude that Payday exceeded the scope of its license when it copied and prepared a modified version of the programs without S.O.S.'s permission.[10] Whether these acts, unshielded by any license, infringed S.O.S.'s copyright will be a matter for the district court to determine on remand.[11]

Payday, on the other hand, may well have assumed that its purchase price for right of use would include the right to use the software on its own computer, if it ever purchased one. It could reasonably have assumed that S.O.S., not Payday, would bear the costs of protecting S.O.S.'s trade secret interests. This would not affect the extent of the license granted. Payday would be entitled to possess a copy of the software to enable it to exercise its limited right of use, but would not *own* that copy.

An owner of a copy of software has certain rights under the Copyright Act which a mere possessor does not. *See, e.g.,* 17 U.S.C. § 117 (right to make copy or adaptation of program if essential to utilization of the program; right to make archival copy); 17 U.S.C. § 109(a) (right to sell or dispose of owned copy).

10. Our analysis of these issues allows us succinctly to resolve two of the parties' other claims. S.O.S. argues that contract language obligating S.O.S. to modify the program as necessary for $50.00 per hour also obligated Payday not to modify the program itself. The district court granted summary judgment in favor of Payday on this claim, relying on its interpretation of the software contract. Because we find that the contract did not give Payday the right to prepare derivative works based on S.O.S.'s programs, summary judgment was inappropriate on this basis. However, if it is determined on remand that Payday's modifications resulted in the creation of a new work rather than a derivative work, the district court will need to consider whether such noninfringing modifications were also prohibited by the contract.

The district court dismissed as moot Payday's declaratory judgment claim of copyright invalidity after determining that Payday had a license to use and modify the software. Because S.O.S.'s claims of copyright infringement are not disposed of by reference to the contract, the issue of copyright invalidity is not moot. Payday will have the opportunity to challenge the validity of S.O.S.'s copyright on remand, by producing evidence of intent to defraud and prejudice to substantiate its allegation of fraud on the copyright office, and by developing its theory that portions of Chu and Koyama's work was not work for hire. Summary judgment in favor of S.O.S. will be appropriate on Payday's challenge based on joint authorship.

11. Because the district court construed the contract between S.O.S. and Payday to permit Payday's uses, it did not need to consider the underlying question of whether Payday's uses, unsh-

## II. Trade Secrets

■ S.O.S. appeals the district court's grant of summary judgment in favor of Payday on S.O.S.'s trade secrets count under the Uniform Trade Secrets Act, Cal. Civ.Code §§ 3426 *et seq.*[12] The facts S.O.S. alleges are essentially the same as in its

ielded by the contract, infringed S.O.S.'s copyright. We similarly do not need to reach that question here. It will remain for S.O.S. to prove that the modified programs prepared by Payday are substantially similar to S.O.S.'s, so as to make them derivative works rather than new works that would not infringe S.O.S.'s copyright. *See Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir.1984).

A second issue is whether Payday might have a defense to its copying of S.O.S.'s programs if it were found at trial that S.O.S. breached its contract by refusing to give Payday a copy of the software unless Payday paid for protective modifications. In that event, copying the software surreptitiously may have been the only means available to Payday to exercise its contractual right of use. We express no opinion as to whether a licensor's breach of contract depriving a licensee of access to copyrighted material can excuse the licensee's copying of that material in order to gain access.

12. Section 3426.1(b) provides:
"Misappropriation" means:
(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
(A) Used improper means to acquire knowledge of the trade secret; or
(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was
(i) Derived from or through a person who had utilized improper means to acquire it;
(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use ...
Section 3426.1(a) provides:
"Improper means" includes ... breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means.
Section 3426.1(d) provides:
"Trade secret" means information, including a ... program ... that:

copyright count, with particular reliance on the way in which Payday obtained its copy of the software.[13] S.O.S. has produced evidence that Payday requested a copy of the software from S.O.S., which S.O.S. refused to provide unless Payday agreed to pay for modifications to block access to the source code, and that Payday responded with self-help, obtaining a copy through Chu and Koyama, who had acquired a copy from the S.O.S. computer.

The district court relied on its copyright license analysis to reject S.O.S.'s claim:

> As a licensee, PAYDAY has the contractual right to use the computer software, and to copy its content for its own purposes.
>
> PAYDAY cannot be held liable for misappropriation of trade secrets because it has a license to use the computer software free from contractual limitations or restrictions. A licensee of a trade secret is not an infringer.

E.R. at 86.

The district court should have focused on how Payday acquired its copy. There is a genuine issue of fact as to whether the contract gave Payday a right to possess only a protected copy of the software if it elected to process its customers' work on its own computer, or whether Payday was entitled to possess an unprotected copy.

The district court relied on *Aktiebolaget Bofors v. United States*, 194 F.2d 145, 148 (D.C.Cir.1951), to support its conclusion that a licensee of a trade secret cannot be an infringer. That case, however, holds only that one who *lawfully* acquires a trade secret, not just tangible property based on a trade secret, can use that trade secret in any manner not otherwise prohibited by contract or other body of law. It is precisely the lawfulness of Payday's acquisition of the trade secret, in the form of the unprotected source code, that is at issue here.

Summary judgment in favor of Payday on this issue was error. S.O.S. has produced evidence rendering the contract susceptible to the interpretation that Payday did not have the right to possess an unprotected copy of the program. S.O.S. also presented evidence sufficient to create genuine issues of material fact as to whether Payday knew or had reason to know that the source code was acquired by improper means, and whether the source code was subject to reasonable efforts by S.O.S. to maintain its secrecy.

### III. Account Stated

■ The district court granted S.O.S.'s motion for summary judgment on its claim for an account stated. The underlying facts are not disputed. In April 1985, S.O.S. sent Payday a statement showing an amount due for programming services under the original contract. Payday does not dispute that S.O.S. performed these services and that the account stated was correct. Payday made payments until September, 1985, reducing its balance to approximately $21,500.00.

---

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Legislative Committee Note to the statute elaborates on the requirements for maintaining a trade secret:

[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of the trade secret, limiting access to a trade secret on "need to know basis," and controlling plant access.... [R]easonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

**13.** States may regulate trade secrets only to the extent that such regulation does not conflict with federal patent or copyright law. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974); *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1089 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). Since the California statute pleaded in this case does not involve a legal or equitable right equivalent to an exclusive right of a copyright owner under the Copyright Act, but only prohibits certain means of obtaining confidential information, its application here would not conflict with federal copyright law. *See* 17 U.S.C. § 301(b).

Payday asserts three grounds for reversal. First, it argues that since there was no dispute or settlement concerning the amount, and the parties were still transacting business, there is a triable issue of fact unresolvable by summary judgment. This argument confuses an account stated with accord and satisfaction. "An account stated is an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other." *Trafton v. Youngblood*, 69 Cal.2d 17, 25, 69 Cal.Rptr. 568, 573, 442 P.2d 648, 653 (1968). Payday's agreement with S.O.S.'s letter was all that was required to create an account stated.

■ Payday next asserts that S.O.S.'s alleged breach of contract in refusing to give it an unprotected copy of the software should relieve Payday of the obligation to pay. However, even assuming *arguendo* that S.O.S. breached the contract, this would not affect the result. Under California law, an account stated is a new contract, and an action on it is not based on the original contract, but on the balance confirmed by the parties. *Gleason v. Klamer*, 103 Cal.App.3d 782, 786–87, 163 Cal.Rptr. 483, 485 (1980). An account stated may be attacked only by proof of "fraud, duress, mistake, or other grounds cognizable in equity for the avoidance of an instrument." *Id.* Although an account stated is dependent on a valid underlying liability which accrued before rendering the account, *Trafton*, 69 Cal.Rptr. at 574, "it is not open to a defendant to attempt to defeat the legal effect of [an account stated] by showing a lack of consideration in any other way. Thus, it is not open to a defendant in such a case merely to show that the account stated was based upon a disputed claim of the plaintiff's, which claim subsequently proved to be invalid.... All such evidence going to total or partial lack of consideration is forever debarred by the convention and agreement of the parties, for this is of the very essence of an account stated." *Gardner v. Watson*, 170 Cal. 570, 577, 150 P. 994, 996 (1915). A party who consents to an account stated has agreed that it has become liable for that amount by the other party's performance. Payday is claiming only that S.O.S.'s *subsequent* breach affected its previous liability. This defense to an account stated is not recognized in California law.

■ Payday's final argument is that there is no pendent jurisdiction, because an account stated is distinct from the underlying contract. This argument lacks merit. The state law account stated claim and federal law copyright claims "derive from a common nucleus of operative fact," "such that [the parties] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Summary judgment in favor of S.O.S. on the account stated claim was proper and is affirmed.

## IV. Abuse of Process

■ On November 22, 1985, S.O.S. sought and obtained an ex parte writ for the seizure of the computer programs in possession of Payday. Shortly after, Payday obtained a modification of the writ. In its counterclaim for abuse of process, Payday asserts that S.O.S.'s writ of seizure was obtained through misrepresentations including exaggeration of the scope of S.O.S.'s copyright and denial of Payday's license. Because Payday was able to obtain a prompt modification of the writ, it has not claimed damages other than its attorneys' fees incurred in its efforts to modify and vacate the writ. The district court granted summary judgment for S.O.S. on several grounds, only one of which is necessary for affirmance.

Even if Payday's claims of misrepresentation are true, it has pleaded the wrong cause of action:

> [W]hile a defendant's act of improperly instituting or maintaining an action may, in an appropriate case, give rise to a cause of action for malicious prosecution, the mere filing or maintenance of a lawsuit—even for an improper purpose—is not a proper basis for an abuse of process action.

*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1169, 232 Cal.Rptr. 567, 574, 728 P.2d 1202, 1209 (1986); *see also Spellens v. Spellens*, 49 Cal.2d 210, 232, 317 P.2d 613, 626 (1957) (abuse of process not found in wrongful procurement of legal process, but in misuse of process after it issues for any purpose other than that which it was designed to accomplish).[14]

### V. Breach of Contract and Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing

Payday asserts that S.O.S. committed a breach of contract and tortious breach of the implied covenant of good faith and fair dealing by denying implicitly the existence of Payday's license. Payday seeks nominal damages, attorneys' fees, and punitive damages. The district court dismissed the contract claim on the ground that the contract did not provide for attorneys' fees, which were the only actual damages sought, and the implied covenant claim on the ground that the contract between Payday and S.O.S. did not give rise to the sort of special relationship that would give rise to tort liability.

The district court decided these claims correctly. Payday cannot recover its attorneys' fees as damages under a contract theory, where neither statute nor contract provide for attorneys' fees in the event of breach. Cal.Code Civ.Proc. § 1021.[15]

Nor does Payday have a cause of action in tort for breach of the implied

covenant of good faith and fair dealing. California recognizes such torts only in the context of insurance contracts and other contracts where there is a "special relationship" between the parties to the contract, characterized by elements of public interest, adhesion, and fiduciary responsibility. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 687–88, 254 Cal.Rptr. 211, 230, 765 P.2d 373, 392 (1988), *citing Seaman's Direct Buying Service v. Standard Oil Co.*, 36 Cal.3d 752, 768–69, 206 Cal.Rptr. 354, 362–63, 686 P.2d 1158, 1166–67 (1984). Payday can not demonstrate the existence of such a special relationship here.

## CONCLUSION

We reverse the district court's grant of summary judgment in favor of Payday on the issue of copyright infringement, and remand for further proceedings consistent with this opinion. We also reverse and remand on S.O.S.'s breach of contract and trade secrets counts.

We affirm the district court's grants of summary judgment in favor of S.O.S. on its account stated claim and dismissing Payday's counterclaims for abuse of process, tortious breach of the implied covenant of good faith and fair dealing and breach of contract.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

---

**14.** Payday in its Reply Brief asks us to delete a finding of fact made in the course of granting S.O.S.'s motion for summary judgment on this counterclaim, to avoid res judicata or law of the case effect should Payday elect to file a claim for malicious prosecution. That finding of fact states, in effect, that S.O.S. had a proper motive in seeking the writ. E.R. 102 ¶ 9. Because we affirm the district court's grant of summary judgment on the basis that Payday pled the wrong cause of action, this finding of fact is not necessary to support any judgment so far rendered in this case. We therefore decline either to affirm or upset this finding. We note that Payday has so far presented no evidence that S.O.S. lacked any proper motive or that its action in seeking the writ was baseless. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S.

731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983). Whether Payday should be allowed to present additional evidence to support a malicious prosecution claim is a question we leave to be decided in the first instance by the trial court when and if Payday brings such a claim.

**15.** Nor can the contract be construed as an implied covenant not to sue, as Payday argues. The cases cited by Payday establish only that a contract of *settlement* includes an implied covenant not to sue. *See, e.g., Winchester Drive–In Theatre, Inc. v. Warner Bros. Pictures Distributing Corp.*, 358 F.2d 432, 436 (9th Cir.1966). The contract between Payday and S.O.S. is clearly not a contract of settlement.