# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASSET MARKETING SYSTEMS, INC.,
  *Plaintiff-counter-defendant-Appellee,*

v.

KEVIN GAGNON, d/b/a MISTER COMPUTER,
  *Defendant-counter-claimant-Appellant.*

No. 07-55217

D.C. No.
CV-03-02234-B

OPINION

Appeal from the United States District Court
for the Southern District of California
Rudi M. Brewster, District Judge, Presiding

Argued and Submitted
July 18, 2008—Pasadena, California

Filed September 9, 2008

Before: Barry G. Silverman, Johnnie B. Rawlinson, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

12511

**COUNSEL**

Todd A. Moore, San Diego, California, for the defendant-counter-claimant-appellant.

John Morris and Phillip C. Samouris, Higgs, Fletcher & Mack LLP, San Diego, California, for the plaintiff-counter-defendant-appellee.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

Kevin Gagnon, doing business as Mister Computer (Gagnon), appeals from a grant of summary judgment in favor of Asset Marketing Systems, Inc. (AMS). Gagnon contends that AMS infringed his copyright in six computer programs that he wrote for AMS by continuing to use and modify them

without his consent, and that AMS misappropriated trade secrets contained in the programs' source code. Gagnon also challenges the denial of his ex parte application for an order denying or continuing summary judgment. The district court concluded that Gagnon had granted AMS an unlimited, non-exclusive, implied license to use, modify, and retain the source code of the programs that defeated his copyright infringement and trade secret misappropriation claims. The district court also denied Gagnon's ex parte application. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   AMS and Gagnon's Relationship

AMS is a field marketing organization offering sales and marketing support to insurance marketing entities. From May 1999 to September 2003, Gagnon was an at-will, independent contractor for AMS, hired to assist with its information technology needs. Subsequently, Gagnon was asked to develop custom software for AMS. AMS was Gagnon's largest client, accounting for 98% of his business. Jay Akerstein, a partner at AMS who later became the Chief Operating Officer, was Gagnon's primary contact. Over the course of their four-year relationship, AMS paid Gagnon over $2 million, $250,000 of which was for custom software development and computer classes. Gagnon developed six computer programs for AMS.

In May 2000, AMS and Gagnon entered a Technical Services Agreement (TSA), which was scheduled to expire on April 30, 2001. The TSA, printed on Mister Computer letterhead, set forth Gagnon's fees and the services to be provided. The services included "Custom Application Programming—Consultant will provide Contractor with specific add-on products to enhance Contractor's current in-house database application," and mentioned nothing about a license. The TSA was not renewed, though the relationship continued.

AMS claims that on June 12, 2002, Gagnon signed a Vendor Nondisclosure Agreement (NDA).[1] The NDA would have given AMS ownership of all intellectual property developed for AMS by Gagnon. Gagnon claims that the document is a forgery and that his signature cannot be authenticated.

In June 2003, Gagnon proposed that AMS execute an Outside Vendor Agreement (OVA). The OVA included a Proprietary Rights clause providing:

> Client agrees that all designs, plans, specifications, drawings, inventions, processes, and other information or items produced by Contractor while performing services under this agreement will be the property of Contractor and will be licensed to Client on a non-exclusive basis as will any copyrights, patents, or trademarks obtained by Contractor while performing services under this agreement. On request and at Contractor's expense, Client agrees to help Contractor obtain patents and copyrights for any new developments. This includes providing data, plans, specifications, descriptions, documentation, and other information, as well as assisting Contractor in completing any required application or registration. Any source code or intellectual property will remain the property of Contractor. Trademarks, service marks, or any items identifying said Company shall remain the Company's said property. Contractor will allow Company non exclusive, unlimited licensing of software developed for Company.

Akerstein declined to execute the OVA, but countered with a redlined version of the OVA, which substantially rewrote the Proprietary Rights clause to read:

---

[1]The NDA was located and produced six months into the litigation.

> Contractor agrees that all designs, plans, specifications, drawings, inventions, processes, and other information or items produced by Contractor while performing services under this agreement will be the sole property of Client. Any source code or intellectual property agreed to and documented as Contractor's will remain the property of Contractor.

By the end of June 2003, AMS had decided to terminate Gagnon's services. AMS extended an employment offer to Gagnon, but he declined to accept the offer. AMS and Gagnon then discussed an exit strategy, and by late July, the parties had set a target exit date of September 15, 2003.

In August 2003, Gagnon responded to Akerstein's redlined OVA draft with a letter asserting that his "position has always been that Asset Marketing Systems shall be entitled to unlimited software licensing as long as my company had a business relationship with Asset Marketing Systems." The parties never executed the OVA.

In a letter to AMS dated September 18, 2003, Gagnon demanded $1.75 million for AMS to have the right to continue to use the programs and $2 million for Gagnon's agreement not to sell or disclose the programs to AMS's competitors.

In a letter dated September 23, 2003, AMS terminated its relationship with Gagnon. According to AMS, a consultant identified numerous problems with Gagnon's work. It also stated:

> Recently, we had discussed employee and intellectual property issues which have yet to be resolved. Despite the foregoing, I learned that we did not have copies of the source code for the software we developed and that copies of our SalesLogix software and

our entire database may be maintained by you and your agents offsite.

The letter then demanded:

In connection with that separation, you must immediately provide any and all copies of the source code for all software developed by and on behalf of Asset Marketing Systems immediately. You are not authorized to utilize that software which we believe is owned and all copyrights belong to Asset Marketing Systems. Furthermore, despite your claimed ownership in that copyright, we believe that Asset Marketing Systems' trade secrets are embedded and utilized throughout that software which would preclude use by you as well.

We also demand that you return to us any copies of the SalesLogix software or Asset Marketing databases, programs or other materials that may have come into your possession during our relationship.

Also on September 23, seven of Gagnon's twelve employees resigned and were hired by AMS to provide directly to AMS the same services they previously provided to AMS through Gagnon. According to AMS, Gagnon's former employees approached AMS for jobs, and AMS never solicited them. Gagnon disputes this. Each employee had signed an "Employee's Work Agreement" with Gagnon. The agreement specified that the intellectual property arising out of or related to work performed for Gagnon was his property. The employment agreement also stated that "all information relating to [AMS] disclosed to Employee by Employer, and all information generated by Employee in the performance of the above Work is a valuable trade secret of Employer" to be treated as confidential and safeguarded. Finally, the employees agreed not to "engage in any employment or personal con-

tractual agreement" with AMS for twenty-four months without written consent from Gagnon.

In October 2003, Gagnon sent AMS a cease and desist letter, asserting that the use of the programs was unauthorized. It also asserted that the hiring of Gagnon's prior employees violated their Employment Agreement with him. Gagnon demanded that AMS certify that it had undertaken to remove "all original and derivative source code" and all related files for the programs from AMS computers.

AMS responded by asserting that Gagnon could not unilaterally stop AMS from continuing to use and update the programs because it had an irrevocable license to use, copy, and modify the programs based on the course of conduct of the parties over the past two-and-a-half years. AMS also asserted that Gagnon could not use the programs because it contained AMS's trade secrets. AMS also declined to pay Gagnon the $1.75 to $2 million he had requested in September.

## B.   The Programs

Specifically at issue are the six programs that Gagnon created for AMS. He included a copyright notice, "copyright Mister Computer," in the splash screens for each program.

According to a declaration by one of Gagnon's former employees, the programs were designed to work with AMS's databases and included "detailed information concerning AMS' network of sales persons, including information related to AMS' agent lists, their territories, and the criteria used by AMS to qualify an agent or create a territory." The source code for these programs was installed on several of AMS's development computers, which were located at AMS's facilities.[2] The employee was not instructed by Gagnon to maintain

---

[2]Gagnon disputes that the source code was ever stored on the AMS server.

the source code at any location other than AMS, and Gagnon made no attempt to hide the source code from AMS employees.

In his deposition, Gagnon admitted that after he hired employees, the source code was stored on AMS computers in the development room. The room could not be accessed without a pass that Gagnon's software developers and a few key AMS personnel, including Akerstein, possessed. Gagnon never received any promises of confidentiality with respect to his trade secrets from the AMS personnel who had passes to the development room nor did he discuss terms of a potential license or royalty agreement with them.

A week prior to his termination, Gagnon registered the copyright for these six programs with the United States Copyright Office.

## C.  Procedural History

This case has a convoluted procedural history. The case began when AMS filed a complaint in California Superior Court against Kevin Gagnon, d/b/a Mister Computer, two of his employees[3] and Gagnon's new company, National Marketing Technologies alleging, among other things, misappropriation of trade secrets and conversion. Gagnon removed the case to federal court. Gagnon then filed counterclaims, alleging copyright infringement, unfair competition under California law, misappropriation of trade secrets, interference with contractual relations, intentional interference with prospective business advantage, negligent interference with prospective business advantage, and sought accounting and declaratory relief declaring Gagnon the copyright owner of the programs. The district court (then Judge Jones) remanded AMS's claims back to the state court. AMS then filed its remanded state law

---

[3]The two employees were dismissed from the suit with prejudice.

claims as counter-counterclaims to Gagnon's federal counter-claims.

The district court subsequently granted AMS's motion for summary judgment as to Gagnon's counterclaims. The court found that Gagnon had granted AMS an implied, nonexclusive license to use, modify, and retain the source code of the programs. Consequently, Gagnon's trade secret misappropriation claim was also defeated, and because no trade secret existed as between Gagnon and AMS with respect to the source code, Gagnon's noncompetition agreements were deemed invalid under California law. For the same reasons, Gagnon's remaining state law claims failed.

The court also denied Gagnon's ex parte applications for an order denying or continuing summary judgment and to file written objections to evidence. Gagnon's ex parte application requested a continuance to obtain the backup tapes of AMS's computers because they might contain emails establishing AMS's allegedly unlawful solicitation of Gagnon's employees, and would establish the location of the source code at all relevant times.

The magistrate judge recommended that the motion be denied because it was untimely, and the district court judge adopted that recommendation. The district court first reasoned that because the non-competition clause in Gagnon's employment agreements was unenforceable under California law, any emails evidencing solicitation were irrelevant. Second, because Gagnon had already admitted that the source code was located on AMS's computers, computer backup tapes conclusively locating the source code on AMS computers were unnecessary. Third, the motion was untimely because Gagnon did not request the continuance until after the motion for summary judgment was fully briefed by both parties. Gagnon was able to file his opposition to summary judgment without raising any discovery objections, and several days later, counsel for both parties requested a stay of pending dis-

covery issues until summary judgment. Gagnon filed his ex parte motion a week after the district court ordered the case submitted, causing "undue delay in the resolution of both the summary judgment motion and the discovery motion."

Gagnon next filed a motion for reconsideration, which was denied. The case was then reassigned from Judge Jones to Judge Brewster. At that point, the parties stipulated to a dismissal of all counter-counterclaims, and AMS moved for attorneys fees and costs. Gagnon appealed the grant of summary judgment. The district court then indicated that it wished to reconsider its order granting summary judgment and stayed the proceedings regarding the attorney fees. Gagnon successfully moved this court for a limited remand so that Judge Brewster could reconsider Judge Jones's grant of summary judgment. After remand, the district court denied the motion for reconsideration, deferred resolution of attorneys fees until the resolution of the appeal, and returned the case to this court.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). We view the facts in the light most favorable to the non-moving party and determine whether there exists a genuine issue of material fact and whether the district court correctly applied the law. *Id.*

We review the district court's decision to deny an application to continue a ruling on a summary judgment motion to permit discovery for abuse of discretion. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987). "A district court has wide latitude in controlling discovery." *Id.* at 1416 (internal quotation marks omitted). "The district court should permit discovery if it appears from the affidavits filed that the party opposing the summary judgment motion could not, for

reasons stated, present facts essential to justify his opposition." *Id.* (citing Fed. R. Civ. P. 56(f)).

## DISCUSSION

### A.  Copyright Infringement Claim

Gagnon alleges that AMS's continued use of the six programs constitutes copyright infringement because the programs were used by AMS without its obtaining a license or Gagnon's permission. AMS asserts three defenses to Gagnon's copyright infringement claim: an implied license, a transfer of copyright ownership via the NDA, and 17 U.S.C. § 117. We hold that AMS has an implied unlimited license for the programs, and we do not reach the other defenses asserted by AMS.

[1] Though exclusive licenses must be in writing, 17 U.S.C. § 204, grants of nonexclusive licenses need not be in writing, and may be granted orally or by implication. *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 825-26 (9th Cir. 2001). We have previously considered the grant of an implied license in the context of movie footage and architectural drawings. *Id.*; *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).

In *Effects Associates*, a movie producer hired Effects Associates to create certain special effects for a movie. *Effects*, 908 F.2d at 555-556. Though the film footage containing the special effects was used without the producer's obtaining a written license from Effects Associates, we found that an implied license had been granted because the footage was created at the producer's request with the intent that it be used in the film with no warning that use of the footage would constitute infringement. *Id.* at 558-59 & n.6. We determined that "[t]o hold that Effects did not at the same time convey a license to use the footage . . . would mean that plaintiff's contribution to the film was 'of minimal value,' a conclusion that can't be

squared with the fact that Cohen paid Effects almost $56,000 for this footage." *Id.* at 559.

[2] Thus, we have held that an implied license is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it,[4] and (3) the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (citing *Effects*, 908 F.2d at 558-59) (footnote added). We apply the same analysis we did in *Effects* to implied licenses for computer programs. The last prong of the *Effects* test, however, is not limited to copying and distribution; instead we look at the protected right at issue—here, whether Gagnon intended that AMS use, retain, and modify the programs.

## 1. AMS Requested the Creation of the Programs

[3] Gagnon argues that AMS never specifically requested that he create the programs, but "rather relayed its needs to Mr. Gagnon and he satisfied them by providing either computer hardware or computer software at his discretion." We find this interpretation of "request" to be strained. Gagnon did not create the programs on his own initiative and market them to AMS; rather, he created them in response to AMS's requests. Moreover, after prototype software was developed, he made changes to the programs in response to Akerstein and other AMS employees' requests. No genuine issue of material fact remains as to whether AMS requested the programs.

---

[4]Though delivery of a copy of software does not compel the conclusion that Gagnon granted AMS a license, it is a relevant factor that we may consider. *See* 17 U.S.C. § 202; *Effects*, 908 F.2d at 558 n.6 (recognizing that delivery is not dispositive, but "one factor that may be relied upon in determining that an implied license has been granted").

### 2. Gagnon Created the Software for AMS and Delivered It

Though Gagnon argues that the programs could be converted for use by another company, Gagnon admitted that the programs were created specifically for AMS and that AMS paid for the work related to drafting of the programs as well as some related costs. It is, therefore, undisputed that Gagnon created these programs for AMS.

[4] The remaining question is whether Gagnon delivered the programs to AMS. We agree with the district court that Gagnon delivered them when he installed them onto the AMS computers and stored the source code on-site at AMS. Gagnon argues that even if he had installed the programs onto the AMS computers, he never delivered the source code so that AMS could modify the code.[5] If AMS did not have the right to modify the code, it may have infringed Gagnon's copyright by exceeding the scope of its license. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989). Gagnon primarily points to AMS's inability to locate the code on its own computer systems after his services were terminated to show that AMS did not possess the code. But, as we explain below, Gagnon's conduct manifested an objective intent to give AMS an unlimited license at the time of cre-

---

[5]When programmers write code, they write in "source code," which is written in a programming language that humans can understand. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1243 (3d Cir. 1983) (describing source code and object code). *See also* Michael J. Madison, *Reconstructing the Software License*, 35 Loy. U. Chi. L.J. 275, 280-81 (2003) (same). This source code is then compiled into object code which is essentially a translation of source code into something the computer can understand and execute. *Id.* at 280. Generally, when software is distributed, only the compiled object code is distributed and the programmer retains the source code. *Id.* at 280-81. Regardless of whether the computer program is in object code or source code form, it is copyrightable and protectable. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519-20 (9th Cir. 1993).

ation; thus, when he stored the source code at AMS, the code was delivered.

### 3.  Gagnon's Intent as Manifested by His Conduct

**[5]** Gagnon argues that he never intended that AMS would retain and modify the programs he delivered. Gagnon misunderstands the inquiry into intent, and we conclude that his conduct did manifest an intent to grant a license. The relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct. *See Effects*, 908 F.2d at 559 n.6 (noting that "every objective fact concerning the transaction" supported the finding that an implied license existed); *see also John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003); *I.A.E.*, 74 F.3d at 777. The First and Fourth Circuits consider the following factors to determine such an intent:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Danielson*, 322 F.3d at 41 (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002)). We find this approach to be persuasive.

Gagnon and AMS had an ongoing service relationship in which Gagnon provided technical support for all computer-related problems at AMS; he also created certain custom software applications at AMS's request. The relationship of the

parties indicates neither an intent to grant nor deny a license without Gagnon's future involvement.

**[6]** Several documents exist, however, that reflect the parties' objective intent: the TSA, signed by both parties, the OVA submitted by Gagnon, and Gagnon's letter objecting to Akerstein's proposed changes to the OVA.[6] Courts have looked to contracts, even if unexecuted, as evidence of the intent of the party submitting the contract. *See Johnson v. Jones*, 149 F.3d 494, 501 (6th Cir. 1998) (finding no license where architect submitted contracts containing express provision that drawings could not be used by others except with agreement and compensation); *Nelson-Salabes*, 284 F.3d at 516 (same); *cf. I.A.E.*, 74 F.3d at 776-77 (architect submitted no language indicating an intent to retain control); *see also Foad Consulting*, 270 F.3d at 835-36 (Kozinski, J., concurring) (comparing *Johnson* and *I.A.E.*).

**[7]** The TSA, signed by both parties in 2000 and printed on Mister Computer letterhead, stated only that Gagnon "will provide" AMS "specific add-on products." Nothing in the TSA indicates Gagnon's understanding or intent that continued use of the custom application programming undertaken by Gagnon would be prohibited after the TSA terminated. The TSA also provided that AMS would be billed for Gagnon's services at an hourly rate. Like the special effects creators in *Effects Associates*, Gagnon was well paid for his services. Under the circumstances, it defies logic that AMS would have paid Gagnon for his programming services if AMS could not have used the programs without further payment pursuant to a separate licensing arrangement that was never mentioned in the TSA, and never otherwise requested at the time. This is especially so because custom software is far less valuable without the ability to modify it and because the TSA was set

---

[6]We do not consider the NDA, allegedly signed by Gagnon, because Gagnon contests its validity and argues that his signature was forged, creating a factual dispute inappropriate for resolution on summary judgment.

to expire in one year; one would expect some indication of the need for future licensing if the custom programs were to become unusable after the TSA expired.

[8] The OVA submitted by Gagnon, but never executed, did not evidence any intent by Gagnon to limit AMS's use of the programs. Gagnon argues that the clause, "Client agrees that [intellectual property] produced by Contractor while performing services under this agreement will be the property of Contractor and will be licensed to Client on a non-exclusive basis as will any copyrights, patents, or trademarks obtained by Contractor while performing services under this agreement . . . ," means that his license was conditioned on a continuing relationship with AMS. We disagree. The clause "while performing services under this agreement" modifies the production of the intellectual property and the obtainment of copyrights. Furthermore, the contract then expressly stated, "Contractor will allow Company non-exclusive, unlimited licensing of software developed for Company," eliminating any ambiguity.

[9] Moreover, Gagnon and AMS did not discuss a licensing agreement until their relationship was ending. Gagnon delivered the software without any caveats or limitations on AMS's use of the programs. Even if Gagnon and his employees maintained the software and had primary control over the code, they programmed on-site at AMS on AMS computers to which key AMS personnel had access—conduct that does not demonstrate an intent to retain sole control. The first time Gagnon expressed a contrary intent was in his letter to Akerstein, sent *after* AMS had decided to terminate Gagnon's services.

Finally, the splash screens containing the copyright notice do not negate AMS's license to use the product. The splash screens speak to Gagnon's intent to retain copyright ownership over the programs, not to his intent to grant or not grant a license as would be his right as the copyright owner.

**[10]** Gagnon had to express an intent to retain control over the programs and limit AMS's license if he intended to do so. A belated statement that the programs could not be used after Gagnon's departure, made after the termination decision and well after the creation and delivery of the programs for which substantial sums were paid, was not sufficient to negate all other objective manifestations of intent to grant AMS an unlimited license.

## 4.  Scope and Irrevocability of Implied License

**[11]** For the reasons outlined, we hold that Gagnon granted AMS an unlimited, nonexclusive license to retain, use, and modify the software. Furthermore, because AMS paid consideration, this license is irrevocable. *See Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 882 (5th Cir. 1997); 3-10 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (2008). "[A] nonexclusive license supported by consideration is a contract." *Lulirama*, 128 F.3d at 882; *see also Effects*, 908 F.2d at 559 n.7 (an implied license is a "creature of law, much like any other implied-in-fact contract"). If an implied license accompanied by consideration were revocable at will, the contract would be illusory. *Lulirama*, 128 F.3d at 882-83.

**[12]** We affirm the district court's grant of summary judgment on the copyright infringement claim.

## B.  Trade Secret Misappropriation Claim

**[13]** Gagnon contends that even if AMS obtained an implied license, it still misappropriated his trade secrets that were contained in the programs' source code by hiring away his employees in violation of their employment agreements. Gagnon correctly asserts that source code may contain protected trade secrets even when the software is licensed for use to another party. *See, e.g.*, *S.O.S*, 886 F.2d at 1090. Even

assuming a trade secret exists, however, Gagnon's argument fails.

Gagnon relies on *S.O.S., Inc. v. Payday, Inc.*, which explained that a licensee of a computer program may misappropriate a trade secret if the trade secret was unlawfully acquired. *Id.* His reliance on this case is misplaced. In *S.O.S.*, the licensor, S.O.S., granted to Payday, its licensee, a limited license for use only and "neither party expected Payday to be able to gain access to the source code itself." *Id.* at 1088. Thus, the existence of this limited license failed to settle S.O.S.'s trade secret misappropriation claim because an issue of fact remained as to whether Payday was entitled to possess an unprotected copy of the code that gave it access to the source code. *Id.* at 1090.

**[14]** Here, however, having concluded that Gagnon granted AMS an implied, unlimited license to the programs software, we conclude that AMS could not have misappropriated Gagnon's trade secret. Unlike Payday in *S.O.S.*, AMS was legally entitled to use and modify the source code; the license included access to any trade secret embodied therein.

Furthermore, having concluded that AMS was entitled access to this trade secret, we also conclude that the district court did not err in holding that the non-competition agreements with Gagnon's employees were invalid. Under California law, non-competition agreements are unenforceable unless necessary to protect an employer's trade secret. *See* Cal. Bus. & Prof. Code § 16600 (voiding any contract that restrains anyone from engaging in a lawful profession, trade, or business); *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 288 (Cal. 2008) (Cal. Bus. & Prof. Code § 16600 invalidates non-compete contracts unless they are necessary to protect an employer's trade secrets); *Application Group, Inc. v. Hunter Group, Inc.*, 72 Cal. Rptr. 2d 73, 85 (Ct. App. 1998) (same). Because the non-competition agreements were no longer nec-

essary to protect Gagnon's trade secrets against AMS, they were no longer enforceable in this case.

**[15]** We affirm the district court's grant of summary judgment on the trade secret misappropriation claim.

## C.   Ex Parte Application

Finally, the district court did not abuse its discretion in denying Gagnon's motion for an order denying or continuing summary judgment and to file written objection to evidence. As the district court properly reasoned, the additional evidence was not necessary for Gagnon to oppose the summary judgment motion. In fact, Gagnon was apparently able to craft an opposition to summary judgment without this discovery two weeks prior to his motion, and failed to raise an objection at that time.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is

AFFIRMED.