**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DONNA CORBELLO,
*Plaintiff Appellant*,

v.

THOMAS GAETANO DEVITO,
*Defendant*,

and

FRANKIE VALLI; ROBERT J. GAUDIO;
MARSHALL BRICKMAN; ERIC S.
ELICE; DES MCANUFF; DSHT, INC.,
FKA Dodger State Holding
Theatricals, Inc.; DODGER
THEATRICALS, LTD.; JB VIVA
VEGAS, LP; MICHAEL S. DAVID;
JERSEY BOYS BROADWAY LIMITED
PARTNERSHIP; JERSEY BOYS
RECORDS LIMITED PARTNERSHIP;
SKUNK, INC.; GETTING HOME, INC.,
*Defendants-Appellees*.

No. 12-16733

D.C. No.
2:08-cv-00867-
RCJ-PAL

DONNA CORBELLO,
                *Plaintiff-Appellant*,

v.

THOMAS GAETANO DEVITO,
                        *Defendant*,

and

FRANKIE VALLI; ROBERT J. GAUDIO;
MARSHALL BRICKMAN; ERIC S.
ELICE; DES MCANUFF; DSHT, INC.,
FKA Dodger State Holding
Theatricals, Inc.; DODGER
THEATRICALS, LTD.; JB VIVA
VEGAS, LP; MICHAEL S. DAVID;
JERSEY BOYS BROADWAY LIMITED
PARTNERSHIP; JERSEY BOYS
RECORDS LIMITED PARTNERSHIP;
SKUNK, INC.; GETTING HOME, INC.,
                *Defendants-Appellees*.

No. 13-15826

D.C. No.
2:08-cv-00867-
RCJ-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
June 13, 2014—San Francisco, California

Filed February 10, 2015

Before: Diarmuid F. O'Scannlain, Robert D. Sack [*], and Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge Sack

## SUMMARY[**]

### Copyright

The panel reversed the district court's summary judgment and vacated its assessment of costs against the plaintiff in a copyright case involving the musical "Jersey Boys."

Plaintiff Donna Corbello is the heir of Rex Woodard, ghostwriter of an unpublished autobiography of Thomas DeVito, a former member of the band the "Four Seasons." In 1999 DeVito and another former band member, Nicholas Macioci, executed an agreement granting two of their former bandmates, Frankie Valli and Bob Gaudio, the exclusive right to use aspects of their lives related to the Four Seasons, including their biographies, in the development of a musical.

Applying New York law, the panel held that the 1999 agreement constituted a transfer of ownership of DeVito's derivative-work right in the autobiography, rather than a

---

[*] The Honorable Robert D. Sack, Senior Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

nonexclusive license, to Valli and Gaudio. Distinguishing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), the panel held that a co-owner of a copyright may transfer that right without permission from his co-owner. The panel held that because copyright co-owners must account to one another for any profits earned by exploiting that copyright, the district court erred in rejecting Corbello's claims for accounting and declaratory relief.

The panel also concluded that the defendants had failed to establish the existence of a license as an affirmative defense to Corbello's copyright infringement claims. The panel stated that its conclusion that the 1999 agreement constituted a transfer of ownership of DeVito's derivative-work right would ordinarily preclude Corbello's infringement claims against Valli and Gaudio because a co-owner of a copyright cannot be liable to another co-owner for infringement. But a material issue of fact remained as to whether the agreement's reversionary clause later terminated Valli and Gaudio's ownership right. The panel held that a grant of summary judgment was not appropriate on the ground of an implied license based on DeVito's conduct.

The panel reversed the district court's grant of summary judgment on Corbello's claims for accounting, declaratory relief, and copyright infringement and vacated the district court's assessment of costs against Corbello. It remanded the case for further proceedings.

Concurring in the judgment, Judge Sack agreed that the case must be remanded for further proceedings. He disagreed, however, that the word "biographies" in the 1999 agreement unambiguously included the manuscript of the autobiography ghost written by Woodard, and that the 1999

agreement therefore transferred certain derivative rights in the autobiography to Valli and Gaudio. Judge Sack would conclude that the language in the agreement was ambiguous under New York law. He also wrote that, even if the 1999 agreement unambiguously transferred DeVito's interest in the autobiography, *Sybersound* compels the conclusion that the transfer effected only a nonexclusive, rather than an exclusive, license to use the autobiography for the creation of a musical.

## COUNSEL

Gregory H. Guillot, Gregory H. Guillot, P.C., Dallas, Texas, argued the cause and, along with Lawrence Kasten and Robert H. McKirgan, Lewis and Roca, LLP, Phoenix, Arizona, filed the briefs for the plaintiff-appellant.

Daniel M. Mayeda, Leopold, Petrich & Smith, P.C., Los Angeles, California, argued the cause and, along with Samuel S. Lionel and Maximiliano D. Couvillier III, Lionel, Sawyers & Collins, filed the brief for the defendants-appellees.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a contractual grant of the exclusive right to use an individual's "biographies" to create a Broadway musical stage play also constitutes a transfer of a copyright ownership interest in that individual's unpublished autobiography.

I

A

In 1988, Rex Woodard, a lawyer, journalist, and "Four Seasons" devotee, entered into a written agreement to ghostwrite the autobiography (the "Work") of Thomas DeVito, one of the original members of the band (later known as "Jersey Boys"). Pursuant to this agreement, Woodward and DeVito would split the proceeds from publishing or otherwise exploiting the manuscript. After completing the Work but before securing publication, Woodward succumbed to lung cancer in 1991. Unbeknownst to Woodward's widow and heir, Donna Corbello, DeVito had registered the Work with the U.S. Copyright Office solely under his own name in 1991, four months before Woodward's death.

In 1999, DeVito and another former Four Seasons band member, Nicholas Macioci, executed an agreement (the "1999 Agreement") with two of their former bandmates, Frankie Valli and Bob Gaudio. Pursuant to this agreement, DeVito and Macioci granted to Valli and Gaudio the "exclusive right to use" "aspects of [their lives] related to The Four Seasons including, by way of example, [their] creative contributions, biographies, events in [their lives], names and likenesses (the 'Materials')" to develop a musical stage performance (the "Play") about the "Four Seasons." DeVito and Macioci further waived all claims in connection with the Materials, including any claim for violation of copyright.

After an abortive attempt to create the Play with an initial producer, Valli and Gaudio entered into a twenty-four page letter agreement dated May 1, 2004 (the "2004 Agreement") to produce the Play with another production company.

Pursuant to this agreement, Valli and Gaudio granted the right to use the band, the band's music, and the band members' names, likenesses, and life stories. In exchange for these rights, Valli and Gaudio would receive certain specified advances and royalties calculated as a percentage of gross box-office receipts from future productions. While the contract was printed on the letterhead of Dodgers Theatricals, Ltd., and reserved a space on the signature page for that same entity, the text of the agreement defines a different entity, Dodger Stage Holding Theatricals, Inc., as the "Producer." Pursuant to the 1999 Agreement, Valli and Gaudio were to distribute—and did in fact so distribute—a portion of any such payments received to DeVito. The musical "Jersey Boys," produced pursuant to this Agreement, opened on Broadway in late 2005 to popular and critical acclaim, and has enjoyed continued international success.

B

Corbello first discovered arrangements made by DeVito and his bandmates after she and her sister-in-law renewed their efforts to publish the Work on the eve of the "Jersey Boys" debut. Supposing that the Broadway musical might rekindle interest in the band, she approached DeVito who, after a month of correspondence, rejected her overtures, concluding that the Work was "not saleable." In 2006, the success of "Jersey Boys" prompted Corbello and her sister-in-law to confirm the copyright in the Work in the hope of future exploitation, when they discovered that DeVito had already registered—solely in his own name—a manuscript virtually identical to the Work. Corbello subsequently filed a supplementary application with the U.S. Copyright Office to add Woodward as a coauthor and co-claimant of the Work, which prompted the Office to amend the certificate of

registration to list Woodward and DeVito as coauthors of the
Work and co-claimants thereto.

Based on such revelation, and further accounts from
writers, actors, and others involved in the Play that attributed
inspiration in part to the unpublished autobiography, Corbello
initially brought suit against DeVito for equitable accounting,
declaratory judgment, and breach of contract. Valli's divorce
proceedings in 2008 brought to public light further
documents, including the 1999 Agreement, regarding
DeVito's involvement in producing the Play. Corbello filed
a Third Amended Complaint in May 2011, alleging twenty
causes of action, including equitable accounting, declaratory
judgment, and copyright infringement under both U.S. and
foreign law, not only against DeVito but also against Valli
and Gaudio, as well as the writers, directors, and producers of
the Play and various related entities.

Corbello alleges that the Play constitutes, at least in part,
a "derivative work" of the DeVito autobiography, the right to
create which resides exclusively in the copyright-holders of
the underlying work, and their lawful successors, assignees,
and licensees. Corbello thus concludes that she, as legatee of
Woodward's joint copyright in the Work, deserves to share in
the profits reaped by the various Appellees' licensing and
assignment, or infringement, as the case may be, of the
underlying rights.

Facing dueling motions for summary judgment on several
of the counts, the district court issued two orders,
incorporated into the judgment from which Corbello here
appeals, granting summary judgment to all Appellees on
Corbello's claims for equitable accounting, declaratory
judgment, and copyright infringement. In so ruling, the

district court concluded that (1) the 1999 Agreement constituted not an assignment of DeVito's copyright interest in, but rather a "selectively exclusive license" to use, the Work; (2) the 1999 Agreement, the 2004 Agreement, and DeVito's subsequent conduct sufficiently licensed Appellees to use the Work in developing the Play; and (3) because United States law governs whether the Appellees possessed a valid license to use the Work, Corbello's claims for copyright infringement under foreign law must also fail. Corbello timely appealed, disputing all of these conclusions as well as the district court's taxation of costs against her.[1]

## II

Corbello first contends that the 1999 Agreement constituted a transfer of DeVito's copyright interest in the Work, rather than a selectively exclusive license, and that she, as the legatee of Woodward—a duly registered co-author and co-claimant of the Work—is therefore entitled to a portion of the proceeds resulting from Valli and Gaudio's exploitation of that ownership interest.

"A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright." *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984). Copyright law considers both exclusive licenses and assignments to be "transfer[s] of copyright ownership." 17 U.S.C. § 101. The statute enumerates various rights that copyright owners hold, including the right "to prepare derivative works based upon the copyrighted work." *Id.* § 106(2). Copyright owners may transfer "[a]ny of the exclusive rights comprised in a copyright, including any

---

[1] We have jurisdiction pursuant to 28 U.S.C. § 1291.

subdivision of any of the rights specified by section 106," *id.* § 201(d)(2), so long as the transfer is evidenced by a signed writing, *id.* § 204(a).

The parties do not dispute that Corbello succeeded to her husband's interest in the copyright of the Work. Thus, Corbello's claims for declaratory relief and equitable accounting turn on whether DeVito effectively transferred some quantum of his copyright co-ownership interest to Appellees.

### A

Pursuant to the 1999 Agreement, DeVito "grant[ed] to [Valli and Gaudio] the exclusive right to use and incorporate the Materials in one or more theatrical productions, and any and all ancillary and subsidiary exploitations thereof." As defined in the Agreement, "Materials" includes, *inter alia*, DeVito's "biographies." The 1999 Agreement also contains a provision by which DeVito agreed to "waive any claim in connection with the Materials or Works including . . . any claim that the Works . . . violate any right of . . . copyright."

Despite concluding that the Agreement's inclusion of "biographies" in the definition of "Materials" sufficiently included the Work so as to grant Valli and Gaudio an exclusive license to use it in producing the Play, the district court nevertheless found that the Work fell outside of the Agreement's use of "biographies" for the purpose of transferring ownership of a copyright interest in the Work. We are not persuaded by the district court's interpretation.

The 1999 Agreement is governed by New York law. Under New York law, a contract is unambiguous if "on its

face[, it] is reasonably susceptible of only one meaning." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002). If a contract is unambiguous, the court may not consider extrinsic evidence of the parties' intent. *Id.* at 170.

In the context of the 1999 Agreement, the term "biographies" is not ambiguous. Standard dictionary definitions emphasize that biographies generally include both a formal and substantial written component: a "biography" is a "history of a person's life" (the substance) that is "usually written" (the form). MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998); *accord* OXFORD ENGLISH DICTIONARY (3rd ed. 2010) ("The process of recording the events and circumstances of another person's life, esp. for publication . . . ; the documenting of individual life histories . . . considered as a genre of writing or social history.") (first listed definition); *id.* ("A written account of the life of an individual.") (second listed definition). As an account of DeVito's life that has been reduced to writing, the Work, on its face, qualifies under these straightforward definitions as a "biography."

Nor are we persuaded by Appellees' argument that "biography," as used in the 1999 Agreement, refers not to documented life histories, but rather to the general story of one's life. First, this definition, even when offered by dictionaries, takes a subsidiary position to the more common definition of a documented history. *See* OXFORD ENGLISH DICTIONARY (3rd. ed. 2010) (third and final listed definition); *cf.* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) ("an account of the life of something (as an animal, a coin, or a building)") (third and final listed definition). Moreover, under New York law, courts may not choose to interpret a contractual provision so as to render another term

superfluous.  *See Sayers v. Rochester Telephone Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d. Cir. 1993); *see also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012) (discussing surplusage cannon).  Here, to read "biography" as referring to DeVito's general life story would do just that, as "Materials" is defined to include not only biographies, but also "creative contributions, . . . *events in your life*, names and likenesses."  Thus, Appellees' proposed definition cannot be squared with New York's rules governing proper contract interpretation.

Further, to read "biographies" as Appellees urge would largely defeat the overarching purpose of the Agreement. Under New York law, courts should consider individual contract provisions in light of "the entirety of the agreement in the context of the parties' relationship and circumstances." *In re Riconda*, 688 N.E.2d 248, 252 (N.Y. 1997).  Here, as the Agreement clearly states and uncontradicted by the evidence in the record, the goal of the parties in executing the Agreement was to develop a theatrical adaptation of their own and their band's own histories.[2]  DeVito cannot plausibly claim to have retained his privilege as a copyright co-owner to create derivative theatrical works of any biographical manuscript he owns, yet surrendered exclusively to others his generic "life story," along with his name and likeness, to

---

[2] The fact that Macioci may never have had a written biography, the rights to which he could have transferred via the 1999 Agreement, is perfectly in keeping with such a goal.  The ability to use freely a written biography, if such biography existed, would help Valli and Gaudio create a Play chronicling the history of the band and its members.  The fact that one of the band members may not have actually had such a biography does not negate the fact that, had he had such a biography, it would have assisted Valli and Gaudio in their goal of developing the Play.

create a play. Relinquishing one's right to exploit creatively his or her "life story," while at the same time retaining a corresponding right over one's written biography, would be a self-defeating endeavor. We decline to impute such an incompatible purpose to the definition of "biographies" in the 1999 Agreement.

Pursuant to the 1999 Agreement, Devito granted Valli and Gaudio the "exclusive right to use" his "biographies," unambiguously including the Work, to create a play. Such play constitutes a "derivative work," the right to create which resides in each copyright holder of the underlying work and may be transferred by that holder to a third party.[3] Thus, in granting this exclusive right to create, whether classified as an exclusive license or an assignment, the 1999 Agreement constitutes a transfer of ownership of Devito's derivative-work right in the Work to Valli and Gaudio.

B

Appellees argue that our precedent, *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), prohibits a co-owner of a copyright, such as DeVito, from transferring that right without permission from his co-owner, in this instance, Corbello. But that argument stretches *Sybersound*'s holding too far.

---

[3] Despite the concerns expressed by the concurrence, including the Work in the definition of "biographies" does not restrict DeVito from exercising those other statutory rights of copyright ownership identified in 17 U.S.C. § 106 (assuming, of course, that DeVito has not independently transferred those rights to third parties). *See infra*, at 26–28 (Sack, J., concurring). The Agreement simply restricts DeVito from alone using the Work to create a theatrical production.

Copyright "is a creature of statute, and the only rights that exist under copyright law are those granted by statute." *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883–84 (9th Cir. 2005) (en banc). Specifically, "[a] copyright consists of a bundle of six statutorily created rights, currently codified at 17 U.S.C. § 106." *Sybersound*, 517 F.3d at 1145 n.3.[4] While § 106 identifies what rights are included in a copyright, § 201(d) describes how an owner can transfer a

---

[4] The six statutorily created rights created by 17 U.S.C. § 106 include the right:

> "(1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

17 U.S.C. § 106.

copyright and its component parts. *See* 17 U.S.C. § 201(d). Section 201(d)(1) provides that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law[.]" *Id.* § 201(d)(1). And § 201(d)(2) states that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of the rights specified in section 106, may be transferred as provided by [§ 201(d)(1)] and owned separately." *Id.* § 201(d)(2).

We had several occasions prior to *Sybersound* to interpret § 201(d)'s broad language authorizing the alienabilty of copyrights. In *Bagdadi v. Nazar*, we explained, "[i]t is important to note that the various rights included in a copyright are divisible and that 'any of the exclusive rights comprised in a copyright . . . may be transferred . . . and owned separately.'" 84 F.3d 1194, 1197 (9th Cir. 1996) (citing 17 U.S.C. § 201(d)(2)). In *Gardner v. Nike, Inc.*, we added, "[s]ection 201(d)(1) enables the owner to transfer any fraction of his or her ownership interest to another party, thereby making that party a whole or joint owner." 279 F.3d 774, 779 (9th Cir. 2002). And in *Silvers v. Sony Pictures*, an en banc panel explained that the six component parts of a copyright "may be chopped up and owned separately, and each separate owner of a subdivided *exclusive* right may sue to enforce that owned portion of an *exclusive* right, no matter how small." 402 F.3d at 887 (emphasis added). In short, we made clear prior to *Sybersound* that copyrights are divisible and that a copyright owner can freely transfer any portion of his ownership interests in that copyright; after all, the plain language of § 201(d) commands as much.

*Sybersound* dealt with a plaintiff's standing to sue for copyright infringement. In that case, several entities together

owned the copyright to nine songs. 517 F.3d at 1144. One such owner attempted to transfer to Sybersound the exclusive right to use those songs for karaoke purposes. *Id.* at 1142. Sybersound later filed a lawsuit against other third parties, alleging those parties were infringing on Sybersound's right to use the songs for karaoke purposes. *Id.* at 1145.

We held that when one co-owner independently attempts to grant an exclusive license of a particular copyright interest, that licensee—in this case, Sybersound—does not have standing to sue alleged third-party infringers. *Id.* at 1146. After all, one co-owner, acting independently, "may not limit the other co-owners' independent rights to exploit the copyright." *Id.* Such a conclusion stems from the self-evident principle that a joint-owner cannot transfer more than he himself holds; thus, an assignment or exclusive license from one joint-owner to a third party cannot bind the other joint-owners or limit their rights in the copyright without their consent. In other words, the third party's right is "exclusive" as to the assigning or licensing co-owner, but not as to the other co-owners and their assignees or licensees. As such, a third-party assignee or licensee lacks standing to challenge the attempted assignments or licenses of other copyright owners.

The *Sybersound* court grounds this venerable principle of copyright law deeply in the statutory text, citing the definition of a "transfer of ownership" as including an assignment or license of any of the "*exclusive rights comprised in a copyright . . . but not including a non exclusive license,*" *id.* (quoting 17 U.S.C. § 101), and a provision that permits subdivision and alienation of "[a]ny of the *exclusive* rights comprised in a copyright," *id.* (quoting 17 U.S.C. § 201(d)). But the Court's emphasis on the word "exclusive" in these

provisions cannot mean that only sole owners possess "exclusive" rights, as such a rule would run directly contrary to another well-settled principle of copyright law: the right of one joint-owner to sue third-party infringers without joining any of his fellow co-owners, a right *Sybersound* itself expressly recognizes. *See id.* at 1145 (noting that "co-owners may bring suit for copyright infringement without joining other co-owners" (citing *Davis v. Blige*, 505 F.3d 90, 99 (2d. Cir. 2007))). After all, the copyright statute permits infringement suits only if brought by owners of an "*exclusive* right" against alleged violators of such "*exclusive* right." 17 U.S.C. § 501 (emphasis added). If an "exclusive right" could only be possessed by a sole owner of a copyright, a co-owner would be unable to bring an infringement action to protect his interest.

Moreover, such a limitation would contradict the principle of the free transferability of copyright ownership interests—a principle reflected in both the express language of § 201(d) and our Circuit precedent, neither of which treat transferability differently based on whether the original copyright owner is a sole owner or a co-owner. *See, e.g.*, *Silvers*, 402 F.3d at 887; *Gardner*, 379 F.3d at 779; *Bagdadi*, 84 F.3d at 1197.[5] Thus, *Sybersound* merely imposes a

---

[5] In fact, we have suggested quite the opposite. We implicitly held prior to the Copyright Act of 1976 that a co-owner of a copyright can transfer its interests in a copyright without the permission of the other co-owners. *See Piantadosi v. Loew's Inc.*, 137 F.2d 534, 536–37 (9th Cir. 1943). Because the Copyright Act of 1976 removed prior restrictions on dividing and transferring the component parts of copyrights, *see Gardner*, 279 F.3d at 777–79, it stands to reason that if co-owners could unilaterally and severally transfer their copyright interests before 1976, co-owners could do the same after 1976. Indeed, § 201(a) specifically contemplates the existence of copyright co-owners. 17 U.S.C. § 201(a) ("The authors of a

standing limitation on copyright assignees and licensees that reflects the basic principle that one cannot give away more than one's share in a copyright—it need not, and should not, be extended to limit a co-owner's ability to transfer unilaterally any exclusive copyright interests that he himself possesses.

Therefore, *Sybersound* presents no obstacle to Devito's exclusive transfer of his derivative-work right to Valli and Gaudio under the 1999 Agreement. Because the Agreement unambiguously transfers Devito's derivative-work right to Valli and Gaudio, and copyright co-owners must account to one another for any profits earned by exploiting that copyright, the district court erred in rejecting Corbello's claims for accounting and declaratory relief.

## III

The district court granted summary judgment in favor of Appellees with respect to Corbello's infringement claims based on its finding that Valli and Gaudio held a license to use the Work in the production of the Play. *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ("The existence of a license creates an affirmative defense to a claim of copyright infringement."). We have concluded, however, that the 1999 Agreement constituted a transfer of DeVito's derivative-work interest in the copyright, rather than a license. Therefore, Appellees

---

joint work are coowners of copyright in the work."). Yet nothing in § 201(d) purports to authorize broad alienability to sole owners of a copyright while simultaneously withholding that same right from co-owners of a copyright.

have necessarily failed to establish the existence of a license as an affirmative defense to Corbello's infringement action.

A

Our conclusion that the 1999 Agreement constituted a transfer of ownership of DeVito's derivative-work right in the Work to Valli and Gaudio would ordinarily preclude Corbello's infringement claims against Valli and Gaudio, as "[a] co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright." *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984). But a material issue of fact remains as to whether the Agreement's reversionary clause later terminated Valli and Gaudio's ownership right, resulting in the Appellees' subsequent infringement upon Corbello's copyright interest.

The Agreement provided that the rights granted therein would continue perpetually either (i) if they merged with the Play pursuant to a contract with an initial producer or (ii) pursuant to a contract into which Valli and Gaudio might enter with a second producer within two years of the initial producer's rights lapsing.

Corbello argues that Valli and Gaudio did not execute the 2004 Agreement (the second production contract) within that two-year period. Specifically, she points to evidence in the record which suggests that the initial producer's rights expired on December 10, 2002, and that the 2004 Agreement, though dated May 1, 2004, was not in fact fully executed until October 27, 2005. If true, the reversionary clause of the 1999 Agreement would have terminated Valli and Gaudio's ownership right as of December 10, 2004, and any subsequent exploitation by Appellees of the Work may have

infringed upon Corbello's copyright interest. Appellees counter with testimony of Michael David, president of Dodger Theatricals, which suggests that the parties to the 2004 Agreement may have reached an oral agreement prior to December 10, 2004. In the face of such contradictory evidence regarding whether the reversionary clause terminated Valli and Gaudio's derivative-work right, disputed material facts preclude summary judgment as to Corbello's infringement claims based on Valli and Gaudio's ownership of the copyright interest.[6]

B

Appellees argue alternatively that DeVito's conduct resulted in a grant to them of an implied nonexclusive license to use the Work, effective regardless of the reversionary clause in the 1999 Agreement. In support of their argument, they cite DeVito's delivery of the Work to the writers of the Play with the apparent intention that they would use the Work to create the Play, along with DeVito's attendance at performances of, and acceptance of royalty checks from, the Play.

---

[6] The district court also held that 17 U.S.C. § 203(a)(4) required DeVito to give Valli and Gaudio written notice before he could terminate their rights via the reversionary clause. But § 203(a)(4) is inapplicable in this case. The Ninth Circuit has held that when "the contract at issue is of a definite duration, neither Section 203, nor any other provision of the Copyright Act, governs [a copyright owner's] right to terminate or rescind the license [or assignment]." *Scholastic Entm't Inc. v. Fox Entm't Grp., Inc.*, 336 F.3d 982, 988 (9th Cir. 2003). In light of the reversionary clause, the 1999 Agreement was of definite duration, and therefore the notice requirement of § 203 does not apply.

While we may consider delivery of a copyrighted object as "a relevant factor" to determine the existence of an implied license, *Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 755 n.4 (9th Cir. 2008), the copyright statute forbids courts from inferring a transfer of copyright or a license from mere delivery of the material object in which the work is embodied.  17 U.S.C. § 202.  Rather, courts should focus primarily on "the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." *Gagnon*, 542 F.3d at 756.  For instance, the Ninth Circuit "ha[s] held that an implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute the work." *Gagnon*, 542 F.3d at 754–55 (internal quotation marks and footnote omitted).

Here, DeVito's intentions in delivering the Work to the writers are unclear at best.  Appellees did not ask DeVito to create the Work.  In fact, the creation of the Work long predated any specific effort on DeVito's part to parlay his life into a Broadway musical.  *Cf. Gagnon*, 542 F.3d at 755 (finding an implied license when, among other things, the licensor created the copyrighted work at the licensee's request).  Moreover, DeVito specifically denied that he ever licensed the Work to Appellees. DeVito initially provided the Work to the writers for the purpose of providing background information on DeVito's friend, Raymond Gyp DeCarlo.  In doing so, DeVito gave explicit instructions that the writers should not duplicate or circulate the Work and that the Work should remain confidential, because DeVito wanted to publish the Work in the future.  The writers then returned the Work to DeVito a mere few days later.  DeVito's apparent

lack of familiarity with the content of the Work as reflected in the Play further undercuts any potential connection between his support of the Play and his support of the Appellees' use of the Work in its production. Finally, the express provisions in the 1999 Agreement governing the use of the Work further controvert any apparent expectation that Valli and Gaudio might have had in otherwise using the Work.

In light of such contradictory facts regarding DeVito's intent in delivering the Work, the district court's grant of summary judgment on the ground of an implied license—to the extent it rested on such a ground—was inappropriate.

IV

Relying on its conclusion that the 1999 Agreement constituted a license of DeVito's copyright interest, rather than a transfer of ownership, the district court granted summary judgment to Appellees on Corbello's claims of infringement under foreign law. Because we here conclude that the Agreement instead constituted a transfer of ownership, summary judgment on such foreign law grounds must be reversed as well.

V

Corbello appeals the district court's assessment of costs against her. Because we reverse the district court's grant of summary judgment, we vacate the award of costs and remand for reconsideration after other proceedings on remand. *See, e.g.*, *Cusano v. Klein*, 264 F.3d 936, 951 (9th Cir. 2001).

## VI

We reverse the district court's grant of summary judgment in favor of Appellees, vacate its assessment of costs against Corbello, and remand for further proceedings consistent with this opinion. We award costs on appeal to Corbello as the substantially prevailing party. *See* Fed. R. App. P. 39(a)(4) ("[I]f a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed as the court orders.").

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**

SACK, Senior Circuit Judge, concurring in the judgment:

I agree that we must remand this case to the district court for further proceedings. I disagree, however, that the word "biographies" in the 1999 Agreement *unambiguously* includes the manuscript of the autobiography of DeVito ghost written by Corbello's decedent Woodard for DeVito ("the Work"), completed some eight years earlier, and that the 1999 Agreement therefore transferred certain derivative rights in the Work to the counter-parties to the Agreement – Valli and Gaudio. First, I would conclude that the language is ambiguous under New York law and remand on that basis for the district court to decide as a matter of fact whether the 1999 Agreement included a transfer of rights with respect to the ghost-written autobiography. But second, even if the 1999 Agreement unambiguously transfers DeVito's interest in the Work, I think *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), compels us to conclude that

the transfer effected only a nonexclusive, rather than an exclusive, license to use the Work for "the creation of a musical stage play."

I

The majority offers a plausible – but not the only plausible – reading of the language of the 1999 Agreement. Because the language at issue "is susceptible to more than one reasonable interpretation," *Brad H. v. City of New York*, 17 N.Y.3d 180, 186, 951 N.E.2d 743, 746 (2011), I agree with the district court that the 1999 Agreement is ambiguous under New York law. I think the following account of why the 1999 Agreement does *not* include the transfer of or license in all or part of the Work is also reasonable:

The parties – DeVito/Nicholas "Massi" Macioci,[1] on the one side, and Valli/Gaudio on the other – entered into the 1999 Agreement to "authorize the creation of a musical stage play based on the life and music of 'The Four Seasons,'" the singing group of which all four were members, and the story of which ultimately was reflected in the highly successful musical "Jersey Boys." The 1999 Agreement explains that "the authors of the play [anticipated by the 1999 Agreement] may wish to use or incorporate certain aspects of your [*i.e.*, DeVito's and Macioci's] life related to The Four Seasons including, by way of example, your creative contributions, *biographies*, events in your life, names and likenesses (the

---

[1] Nicholas "Massi" Macioci, an early member of "The Four Seasons," was also a signatory to the 1999 Agreement. He died in 2000, *Nick Massi, Low Man in the Four Seasons, Dies at 73*, N.Y. Times, Jan. 8, 2001, http://www.nytimes.com/2001/01/08/national/08MASS.html, however, and has no role in the current litigation.

'Materials').'" (Emphasis added). DeVito and Macioci accordingly granted to Valli and Gaudio "the exclusive right to use and incorporate the Materials in one or more theatrical productions."

In other words, Valli and Gaudio purchased from DeVito and Macioci the right to use "certain aspects" of their lives, a category that is then illuminated by several "example[s]," including "biographies." In this light, and taking the document as a whole as we must, *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277, 826 N.E.2d 806, 809 (2005), the term "biographies" is perhaps most naturally read to refer to a "[p]ersonal history," or "the events or circumstances of a person's life, viewed collectively." *Oxford English Dictionary* (3d ed. 2010), *available at* www.oed.com/view/Entry/19219.**[2]** "[B]iographies," like "names and likenesses," may constitute aspects of both DeVito's and Macioci's lives, rather than particular recordings of their lives.**[3]** This reading does not, as the

---

**[2]** I would hesitate to give dispositive effect to the order in which dictionary editors choose to rank their definitions, Maj. Op. at 11. *Cf. Mastrovincenzo v. City of New York*, 435 F.3d 78, 107 (2d Cir. 2006) (Sack, J., concurring in part and dissenting in part) ("I am generally reticent to invoke dictionary definitions, at least in contexts perhaps unforeseen by their [anonymous] writers."). In any event, I note that the first listed definition in *Merriam-Webster's* refer to a biography as "usually" written, suggesting that there are other appropriate uses of the term. *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003), *available at* http://www.merriam-webster.com/dictionary/biography.

**[3]** It may be worth noting, in this connection, that as far as we are aware there was no written Macioci biography or autobiography ever produced the rights to which could have been included, although as a one-time member of the group, he was likely mentioned in DeVito's ghost-written autobiography. Insofar as Macioci's "biography" is concerned, then, it

majority suggests, Maj. Op. at 11–12, threaten to offend the canon against superfluity. "[T]he events or circumstances of a person's life, *viewed collectively*" are, by definition, distinct from the events or circumstances themselves. A collective viewing may entail characterizing events to form a trajectory or story arc, rather than a mere collection of individual events.

Another definition of the word "biography," moreover, suggests that the parties did not necessarily intend to include the Work in the rights granted under 1999 Agreement. A "biography," or "bio," may (and in my experience in being asked for a "biography" or "bio" in connection with some panel discussion, moot court, or the like, very often does) refer to "a brief summary of a person's life and work." *Oxford English Dictionary* (3d ed. 2010), *available at* www.oed.com/view/Entry/19187; *see also, e.g.*, *Doe v. Merck & Co.*, 283 A.D.2d 543, 543, 725 N.Y.S.2d 356, 357 (2d Dep't 2001) (discussing a pharmaceutical company's educational brochure "which contained photographs and biographies of HIV-positive individuals"); *Charney v. Sullivan & Cromwell LLP*, 15 Misc. 3d 1128(A), 841 N.Y.S.2d 217 (N.Y. Sup. Ct. 2007) (discussing a law firm website's use of "biographies of [certain partners], which list the partners' clients and some of the deals they have worked on"). This type of "brief summary," which a playwright might well draw upon, does not seem to me to envision or require a manuscript of a detailed biography that is hundreds of pages long.

In the absence of the manifestation of a contrary intent among the parties, it may be preferable to apply either of the

---

would seem likely that "biography" meant the story of his life.

foregoing definitions, rather than those referring to written manuscripts, which might inappropriately enlarge the general category of "aspects of your life." "When a particular class [*i.e.*, "aspects of your life"] is spoken of, and general words [*i.e.*, "biographies"] follow, the class first mentioned is to be taken as the most comprehensive." *Bers v. Erie R.R. Co.*, 225 N.Y. 543, 546, 122 N.E. 456, 457 (1919) (internal quotation marks omitted). Indeed, as a general matter, we should be "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572 (1978).

In short, the word "biographies" has here at least three plausible meanings, only one of which covers the Work. And the majority's preferred reading is not the only one that makes sense. *See* Maj. Op. at 12–13. The purpose of the 1999 Agreement was to facilitate the creation and production of a theatrical work based on DeVito's or Macioci's life story. Having transferred his right in a single kind of derivative work, DeVito may well have sought to retain the right to publish or otherwise distribute other accounts of his life through books, film, or other media. *Cf.* 17 U.S.C. § 106 (listing, beside the right to prepare derivative works, the copyright owner's rights to reproduce, distribute copies of, publicly perform, publicly display, or transmit the copyrighted work). If under these circumstances, however, DeVito creates a theatrical production based on his life, he runs afoul of the 1999 Agreement and may be liable to Valli and Gaudio.

In this context, leaving the Work outside the scope of the 1999 Agreement makes a great deal of practical sense. Having said nothing in the Agreement explicitly about the

Work, which had been in existence for more than eight years, DeVito remained and remains free to do with his autobiography (subject of course to his obligations to the widow of Woodard, the person who actually wrote it) what people normally try to do with their memoirs (if anything): He can publish it, distribute copies, sell it, read excerpts at public events, license movies and audiobooks, and so on, all without worrying about breaching the Agreement. However, if and only if he attempts to create a play or other theatrical work based on his manuscript, he would be hard-pressed to do so without including events in his life, his life story, etc. He might then be liable to Valli and Gaudio under the Agreement for encroaching on the rights he gave them.

I would, therefore, agree with the district court that the contract's language is ambiguous. I think that court erred, however, in admitting extrinsic evidence to interpret the contract's ambiguous language. The question of ambiguity is a question of law to be resolved by the court, but "[i]f there is ambiguity in the terminology used, [] and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury." *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909 (1973). I would remand this case to the district court for trial.

II

Assuming, despite the foregoing discussion, that the 1999 Agreement does unambiguously include the Work (or were a jury to find the Agreement includes the Work despite the Agreement's facial ambiguity), the question arises: What kind of interest in the Work does the 1999 Agreement transfer

to Valli and Gaudio?  The majority concludes that the Agreement confers an exclusive license or assignment.  Maj. Op. at 18.  I think *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), compels the conclusion, however, that the Agreement would then confer a *non*exclusive license.[4]

In that case, TVT Music Publishing, a co-owner of the copyright of certain songs, attempted to make Sybersound, a karaoke record producer, the "exclusive assignee and licensee of TVT's copyrighted interests for purposes of karaoke use, and also the exclusive assignee of the right to sue to enforce the assigned copyright interest."  *Id.* at 1142 (internal quotation marks omitted).  The other original co-owners of the copyright, several record companies, did not join in granting rights to Sybersound.  *Id.* at 1146.  When other karaoke record producers used songs under license from TVT to Sybersound without Sybersound's permission, Sybersound brought suit against the producers for infringement.  *Id.* at 1142.  This Circuit affirmed the district court's dismissal of the complaint, concluding that Sybersound lacked standing to sue third-party infringers.  *Id.* at 1146.

I agree with the majority's analysis of *Sybersound* except to the extent it concludes that DeVito was legally capable of transferring to Valli and Gaudio an exclusive license of any kind or description.  According to *Sybersound*, one co-owner of a copyright cannot confer an exclusive license on a licensee because she or he has no exclusive right to confer.

---

[4] We are in accord, however, that the 1999 Agreement confers the right to use the 'Materials' to create only one type of derivative work, a theatrical production, Maj. Op. at 13; the only question is whether that right is exclusive or nonexclusive.

*Sybersound*, 517 F.3d at 1146 ("[U]nless all the other co-owners of the copyright joined in granting an exclusive right to Sybersound, TVT, acting solely as a co-owner of the copyright, could grant only a nonexclusive license to Sybersound because TVT may not limit the other co-owners' independent rights to exploit the copyright.") This conclusion may be in tension with other elements of copyright law, as the majority avers, Maj. Op. at 17–18, but courts and commentators appear to be in universal agreement that *Sybersound* stands for the proposition that "a co-owner of a copyright cannot unilaterally alienate [its] share of the intellectual property and instead can 'only grant a nonexclusive license' to a third party." *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 996 (E.D. Wis. 2011) (quoting *Sybersound*, 517 F.3d at 1146), *aff'd on other grounds*, 682 F.3d 687 (7th Cir. 2012); *see also, e.g.*, *Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080, 1084 (N.D. Cal. 2012) (similarly reading *Sybersound*).

The facts of *Sybersound* are in an important respect indistinguishable from those before us. Here, as in *Sybersound*, a single co-owner (here, DeVito; there, TVT) of a particular interest attempted to grant an exclusive license to use a particular part of the co-owner's derivative work right (here, the right to create a derivative theatrical work; there, the right to create a derivative karaoke record) to third parties (here, Valli and Gaudio; there, Sybersound). Here, as in *Sybersound*, the single co-owner attempted to effect this transfer without the consent of the other co-owner(s) (here, Corbello; there, the record companies).

*Sybersound* seems to me to mean that the transfer from DeVito to Valli and Gaudio, like the transfer from TVT to Sybersound, effected a nonexclusive license. DeVito, like

TVT, "succeeded only in transferring what [he] could under 17 U.S.C. § 201(d), a non-exclusive license." *Sybersound*, 517 F.3d at 1146. This application of *Sybersound* does not "limit a co-owner's ability to transfer unilaterally any exclusive copyright interests that he himself possesses." Maj. Op. at 18. It does no more than recognize that DeVito had no exclusive copyright interest in the derivative-work right to a theatrical production to transfer in the first place. Therefore, Valli and Gaudio had a nonexclusive license, and Corbello's sole accounting remedy lies against DeVito. *See* 2 William F. Patry, *Patry on Copyright* § 5.9 (2014) ("Where only one joint author grants a nonexclusive license, the nongranting joint author may not obtain an accounting from the nonexclusive licensee since that licensee is not a joint copyright owner. Instead, the nongranting joint author must obtain the accounting from the granting joint author.").

Commentators have expressed some dissatisfaction with this aspect of *Sybersound*'s holding.[5] As a three-judge panel, we of course are bound by circuit precedent.[6] *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc). Nor

---

[5] For criticism of *Sybersound*, see *Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080, 1084 (N.D. Cal. 2012) (citing III *Goldstein on Copyright* § 15.5 (3d ed. 2011); 4 *Nimmer on Copyright* § 6.10[A][2][d] (rev. ed. 2012); 2 *Patry on Copyright* § 5:103 (2012)), in which it was noted that the district court there had to, as we must, follow *Sybersound* nonetheless.

[6] The majority correctly observes that the circuit's pre-*Sybersound* precedent supports the conclusion "that copyrights are divisible and that a copyright owner can freely transfer any portion of his ownership interests in that copyright." Maj. Op. at 15. But *Sybersound* reasoned that those ownership interests are limited in the case of a co-owner, who "is not the exclusive owner" of the copyright and thus can transfer only a nonexclusive license. *Sybersound*, 517 F.3d at 1146.

can we ignore the substantial similarity between the facts of *Sybersound* and those of this case.  We are, in my view, required to treat Valli and Gaudio's copyright interest as a nonexclusive license.[7]     Just as this Court rejected Sybersound's claim against those who used karaoke versions of songs contrary to Sybersound's purported exclusive right to do so because the purported licensor (TVT) had no right to grant such exclusive use to Sybersound in the first place, we should reject the plaintiff's accounting claim against Valli and Gaudio.

## III

In sum, then, I would decide that the contract is ambiguous as to whether the Work is included within the Materials.  Because the contract is ambiguous, the district court erred by determining the meaning of the contract on the basis of parol evidence at summary judgment.  I would therefore remand to the district court for further proceedings.  But it would vastly simplify matters, I think, if in that case the district court first decided the defendants' summary judgment motion arguing that *Jersey Boys* does not infringe

---

[7] I would reject the district court's apparently newly coined term "selectively exclusive licence."  The court's description of the practical effects of DeVito's failed attempt to transfer an exclusive license seems to me correct under *Sybersound*.  But, under the principle of *numerus clausus*, I would avoid risking the creation of a new form of copyright interest.  *See* Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property: The Numerus Clausus Principle*, 110 Yale L.J. 1, 3–4 (2000).  If we were to fully describe the transaction between DeVito and Valli and Gaudio, which we need not do in this case, I think that transaction is better described in terms of an already existing form of copyright interest (a nonexclusive license), plus a contract-based promise by DeVito not to re-license the same rights to anyone else.

the Work as a matter of law in any event, *see, e.g.*, *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076–77 (9th Cir. 2006), an issue which it previously avoided by granting summary judgment on contract grounds, *Corbello v. DeVito*, 844 F. Supp. 2d 1136, 1154–55 (D. Nev. 2012). That might be the end of the matter as far as "Jersey Boys" Valli and Gaudio are concerned irrespective of the difficult issues that the majority and we address here.

Even if the 1999 Agreement unambiguously included the Work, as the majority conclude, I would decide that DeVito granted Valli and Gaudio only a nonexclusive license to use the Work toward a theatrical production. Corbello's accounting action properly lies, then, against DeVito, not Valli and Gaudio, and the latter action must be rejected.